## JOHN F. OLDFIELD

*vs.*

## THE INTERNATIONAL MOTOR COMPANY.

*Sale of Motor Truck—Live Load Capacity—Construction of Contract.*

In a contract for the sale of a motor truck, a specification, "Saurer chassis with a maximum guaranteed live load capacity of ten thousand pounds with regular equipment in accordance with standard specifications," *held* not to involve a guaranty merely that the truck should have a capacity of 11,500 pounds, inclusive of the body, by reason of the fact that the vendor's catalogue, under the heading "Saurer five ton, General, Mechanical Specifications," contained the clause, "Capacity.—Normal carrying capacity inclusive of body, 11,500 pounds."

*Decided February 2nd, 1921.*

Appeal from the Baltimore City Court (DUFFY, J.). For opinion on former appeal, see 134 Md. 207.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*J. Royall Tippett* and *James J. Archer,* with whom was *Wm. P. Constable* on the brief, for the appellant.

*Edgar Allan Poe* and *Carl McKendrick,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the court.

This is the second appeal in this case. The first appeal was from a judgment in favor of the plaintiff, and the judgment was reversed by this Court for errors in the prayers fixing the measure of damages. This appeal is from a judgment in favor of the defendant, and brings up for review the action of the court below on the prayers construing the con-

tract between the plaintiff and defendant, and its rulings on the evidence embraced in two bills of exception.

In 1914 and 1915 the defendant company was engaged in the manufacture and sale of motor trucks of differnt makes and sizes, and maintained a factory at Plainfield, New Jersey, where it built the chassis, and a plant in New York, where the bodies of the trucks were constructed and placed on the chassis. In the fall of 1914 the plaintiff was contemplating starting a truck line for the transportation of miscellaneous freight between Baltimore and Havre de Grace, over the state road then under construction, and with that end in view he got into communication with Mr. Charles T. Cronin, who represented the defendant in Baltimore, and who gave the plaintiff one of the defendant's catalogues, containing "general, mechanical specifications" of the chassis manufactured by it, and also "gave him a demonstration of what" a 6½ ton Saurer "truck could do." The road between Havre de Grace and Baltimore was completed in the spring of 1915, and in June the plaintiff went to see Mr. Cronin again, and Mr. Cronin took him to the defendant's factory in Plainfield and from there to its plant in New York, where he met Mr. Fetzer, head of the defendant's sales department, and Mr. Fulton, vice-president of the defendant. The plaintiff states that he explained to them that he wanted a truck of "five ton capacity," and the purpose for which he wanted it, and that they recommended a Saurer truck, with a 177½-inch wheel base, and a body like one they showed him and which they were building for another man to haul green groceries in. Mr. Cronin, a witness for the defendant, testified that when he took the plaintiff to Plainfield and New York he tried to interest him in a Mack truck, that "the Saurer truck used approximately 66 2/3 per cent. of the amount of gasoline that the Mack truck used and weighed 5,900 pounds, while the weight of the Mack was 8500" pounds, and that the plaintiff thought that the Mack truck was too heavy and would require too much gasoline and oil. The plaintiff further testified that shortly after that visit he had an occasion to go to New

York and went to the defendant's factory again to see the
gentlemen he had met there, that the body that they had pre-
viously recommended had then been completed and was on
the chassis, that he told them he thought it would be satis-
factory, except that it was open in front, that they suggested
that they could make a glass front, and insisted on getting up
a sketch, which they did while he was there, and later mailed
him a blue print of it, that in talking to Mr. Fetzer and his
assistant about the body, he asked them particularly about the
weight of the body, and they told him they could not tell him
positively about that, but that he could speak to Mr. Calla-
han, who was getting up the sketch of the body, and who could
give him "positive information" as to what the body would
weigh; that he then talked to Mr. Callahan, and that he said
to the plaintiff, "Mr. Oldfield, it will weigh not less than
1250 pounds and not more than 1500 pounds. You can de-
pend on that"; that it was in that connection they told him
they would send him a blue print of the body, which they
did, and on the 28th of June, 1915, the Monday or Tuesday
following the receipt of the blue print, he went to Baltimore
to see Mr. Rulon, the defendant's representative there, who
had a copy of the blue print and a contract of purchase al-
ready signed by the defendant company; that he agreed to
purchase the truck on the terms set out in the contract, which
he then signed, and the truck was delivered to and paid for
by him on the 16th of August, 1915. The contract, which,
with the blue print, was offered in evidence, is as follows:

"International Motor Company,
"General Offices,
"Broadway and Fifty-seventh Street,
"Original.          New York.                    6363
"Proposal.
"Baltimore, Md., June 28, 1915.
"To John F. Oldfield,
"(Hereinafter called the Purchaser),
"Belair, Harford County, Maryland.
"The International Motor Company (hereinafter
called the Company) proposes to sell purchaser One

(1) Saurer chassis with Maximum Guaranteed Live Load Capacity of Ten thousand (10,000) Pounds with regular equipment in accordance with Standard specifications, which are to be considered part of this contract when accepted by the Purchaser (complete with body as specified herein).

"Delivery as follows: Truck to be shipped from the Company's shops on or about August 1st, 1915 (  ) days after acceptance of order and receipt of final detailed information, at the prices affixed, viz:

"Chassis—Type No. 1, capacity 10,000 Pounds; maximum length of Body to be used, Wheel Base,  ` feet 177½ inches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $4,800.00

"Tires—Front, 36x5 Single Goodrich Demountable; Rear, 42x6 Dual.

"Body Style—As per blue print No. 5969.    450.00

"Paint Chassis—As per sample.

"Paint Body—As per sample.

                                   $5,250.00

"Lettering—(Sketch must accompany order.)

"Extra Equipment—Towing eye-bolt to be installed as per sketch.

"Less special allowance. . . . . . . . . . . . . . . .  1,040.00

"Total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$4,210.00

"Delivered f. o. b. cars at factory.

"Terms of Payment (all payments must be made to the order of the Company in New York funds)—Cash on delivery.

"Shipping Instructions—Over the road ($30), No More.

"Guarantee—The Company guarantees all parts of cars and trucks against defective material and workmanship for a period of one year from date of shipment to the extent that they will furnish free of charge f. o. b. Factory new parts in exchange for defective

parts, provided said defective parts are returned to the factory, charges prepaid. This guarantee does not apply to chains, tires, electrical equipment, or other accessories not manufactured by the Company, nor to damages or breakages resulting from wear and tear, accident or misuse. No guarantee express or implied other than herein stated is made by the Company.

"Title and Ownership—The title and ownership of the Motor Vehicles, parts and accessories called for and furnished under the terms of this contract shall remain in the Company until the full and final payment of the cash therefor shall have been made by the Purchaser. In case of default in any of the payments above provided for, the Company may repossess itself of the above mentioned Motor Vehicles, parts and accessories wherever found, and shall not be liable in any action at law on the part of said Purchaser for such reclamation of its property, nor for the payment of any money or moneys which may have been paid by said Purchaser in part payment of said shipment. The Company shall not be held responsible or liable for any loss, damage, detention or delay caused by fire, strike, accident or by any other cause which is unavoidable or beyond its reasonable control, or in any event for consequential damages, and the receipt of the apparatus by the Purchaser upon its delivery shall constitute a waiver of all claims for loss or damage due to delay. All previous communications between the parties hereto, either verbal or written, with reference to the subject-matter of the proposal are hereby abrogated, and the proposal duly accepted by the Purchaser and approved by an Executive Officer of the Company at New York City, constitute the agreement between the parties hereto, and no modifications of this agreement shall be binding upon either party unless such modifications shall be in writing, and duly accepted and agreed to by the Purchaser, and approved by an Executive Officer of the Company. This proposal is for immediate acceptance by the Purchaser,

and must be approved by an Executive Officer of the Company in order to make it binding upon the Company.

"International Motor Company,

By "Charles T. Cronin (Salesman).

"ACCEPTANCE.

"The foregoing is hereby accepted at the price and upon the terms and conditions named herein.

"Dated June 28, 1915.

"John F. Oldfield.

"This contract is approved and receipt of. ($        ) Dollars is hereby acknowledged.

"New York, N. Y., June 30, 1915.

"International Motor Company,

"By R. W. Fulton (Vice-President)."

The plaintiff also offered in evidence the catalogue issued by the company and given to him, and the record contains the following clauses taken therefrom, under the heading "Saurer five ton, general, mechanical specifications":

"Capacity—Normal carrying capacity inclusive of body, 11,500 pounds.

"Weight—Weight of chassis with tires and driver's seat, but without body, 5,990 pounds.

"Speeds—Four speeds forward and one reverse, giving at 1,000 r. p. m. of motor 3.13, 6.25, 8.33 and 1.25 miles per hour, respectively, and 3.13 miles per hour on the reverse, with sprockets 13.38.

"Motor—The Saurer motor is of the four cylinder, etc.

"Transmission—The gears are of the selective type, etc.

"Differential—The differential is of the four pinion type, etc.

"Driving Shaft—The driving shaft is of chrome nickel steel, etc.

"Clutch—The clutch is of the cone type, etc.

"Axles—The axles are of manganese steel, etc.

"Wheels—The wheels are of wood artillery type, etc.

"Tires—The tires are of solid rubber, etc.

"Springs—Springs are of semi-elliptic type, etc.

"Frame—The frame is of steel, especially designed for the spring suspension employed. Dimensions of frame to receive loading platform, 11 feet 5½ in. by 39⅜ in.

"Lubrication—This is by four feed lubrication system, etc.

"Cooling System—Cooling system consists of honeycomb type radiator, etc.

"Ignition—High tension magneto, etc.

"Carburetor—The carburetor is the Saurer economy, two nozzle type, etc.

"Brakes—The chassis is provided with three independent braking systems, etc.

"Steering Wheel—The steering mechanism is of the irreversible worm and sector type, etc.

"Wheel Base—153½ inches (12 ft. 9½ in.), tread 66¼ inches (5 ft. 6¼ in.), height the top of frame is 29½ inches above the ground under full load."

Mr. Callahan, who was called by the defendant, testified that the plaintiff was introduced to him by Mr. Fitzer, who gave him instructions "to make a drawing, design a body, for Mr. Oldfield, who was going to buy a five-ton Saurer truck with a long wheel base." He denied that he told the plaintiff that the body would weigh not less than 1250 pounds and not more than 1500 pounds. On cross-examination he stated that he had been with the defendant since 1912 and had probably designed as many as five hundred bodies; "that he would design a body of the type to fit the chassis that the purchaser ordered or was going to order; that they did not have a standard body; * * * that the plaintiff wanted a body so that he could carry as large a load as possible on the truck, but it was to be a five-ton truck with a long wheel base; * * * that for a five-ton long wheel base truck that body was suitable."

The plaintiff also offered evidence tending to show that the truck was defective; that the body of the truck weighed 4350

pounds and that the chassis weighed 6130 pounds; that the truck did not have a "live load capacity" of 10,000 pounds, and that in consequence thereof he had difficulty and incurred expense in operating it over the route between Baltimore and Havre de Grace and sustained considerable loss in his business, and after using the truck about fifteen months sold it for $700. The undisputed evidence shows that the "live load capacity" of a chassis or truck means the amount of freight it will carry, exclusive of the weight of the chassis and body.

Leaving out of consideration all that was said by the plaintiff and the representatives of the defendant prior to the execution of the contract in question, and without regard to any statements made by the plaintiff, or representations of the agents of the defendant, leading up to the execution of the contract, it is apparent that what the defendant contracted to furnish, and the plaintiff agreed to purchase, was a Saurer chassis, with a maximum live load capacity of ten thousand pounds, a wheel base of 177½ inches and a body made in accordance with the blue print sent to the plaintiff and referred to in the body of the contract. As it is conceded that the "live load capacity" of a chassis or truck means the amount of freight it will carry, exclusive of the weight of the chassis and body, and as the contract *expressly* guaranteed that the chassis would have a live load capacity of ten thousand pounds, it is equally apparent that if the chassis or truck in question did not have the capacity so specified and guaranteed it was not a compliance with the terms of the contract.

It is earnestly contended by the appellee that as the thing sold under the contract was a "Saurer chassis with a maximum guaranteed live load capacity of ten thousand pounds with regular equipment in accordance with standard specifications, which are to be considered as part of the contract when accepted by the purchaser," etc., and as the catalogue of the defendant, under the heading, "Saurer five ton, general, mechanical specifications," contained the clause; "capacity— normal carrying capacity inclusive of body, 11,500 pounds," the contract should be construed to mean that the truck sold

to the plaintiff would have a capacity of 11,500 pounds, inclusive of the body, or in other words, that the truck would have a capacity of 10,000 pounds in addition to a body weighing 1500 pounds.   To give the contract that construction would not only require us to ignore the conceded meaning of the terms "live load capacity," used in the contract, but would also require us to qualify and change the terms of the express warranty contained therein by adding thereto the proviso, "provided the body specified herein does not weigh more than 1500 pounds."   And this, too, notwithstanding the specifications contained in the catalogue did not purport to be "standard specifications," but "Saurer five ton, general, mechanical specifications"; notwithstanding the catalogue did not contain any specifications in regard to the body; notwithstanding the defendant's witness testified that the defendant did not have a "standard" body, and notwithstanding the "mechanical specifications" in the catalogue referred to a five-ton chassis weighing 5,990 pounds, with a wheel base of 153½ inches, while the contract in suit relates to a truck with a wheel base of 177½ inches.   Moreover, if, following the reasoning of the appellant, the express terms of the contract are to give way to the specifications mentioned in the catalogue, then the defendant was clearly in default in furnishing a chassis that weighed 6,130 pounds instead of 5,990 pounds, with a wheel base of 177½ inches instead of a wheel base of 153½ inches.   We do not think, however, that the contract is open to such a construction, or that there is any doubt as to its meaning.   What the defendant, in plain terms, engaged to furnish, was a Saurer chassis with a *live load* capacity of ten thousand pounds, and a body according to the blue print prepared and furnished by it.   If the defendant, who prepared the contract, had intended to make its warranty of the capacity of the chassis or truck dependent upon the weight of the body it was constructing, it could easily and doubtless would have done so by guaranteeing its "dead load" capacity instead of its "live load" capacity, or by simply stating that the guaranteed live load capacity was

subject to the condition that the body did not weigh more than, say, 1500 pounds, and the defendant would certainly not have left such an important qualification of its express warranty to doubtful inference from the "mechanical specifications" in its catalogue, which did not even purport to apply to a chassis with a wheel base of 177½ inches, and which contained no specifications whatever in regard to the body, or the weight of the body.

The view we have expressed is apparently the view adopted by this Court on the former appeal. In the first trial the court below granted the plaintiff's first prayer, which instructed the jury that if they found that the plaintiff and defendant executed the contract dated June 28th, 1915, and that in pursuance thereof the defendant delivered the truck mentioned in the evidence to the plaintiff and the plaintiff paid therefor, and further found that the chassis of said truck did not have a maximum live load capacity of ten thousand pounds as guaranteed in said contract, then the plaintiff was entitled to recover. Referring to this prayer, JUDGE BRISCOE, speaking for the court, said: "Coming now to the action of the court on the prayers, we find that the plaintiff's first prayer properly instructed the jury that if they found the facts set out in the prayer, then the plaintiff was entitled to recover." It is true, on the first appeal, there was no exception to the plaintiff's first prayer, and it was not, strictly speaking, subject to review, but it nevertheless received the favorable consideration of the court. In the second trial, the court below refused to grant the plaintiff's third prayer, which contained the same instruction, except in connection with defendant's second prayer, which in effect told the jury that the plaintiff was not entitled to recover unless they found the truck delivered to the plaintiff was not capable of carrying a live load of ten thousand pounds, "exclusive of the weight of a body not exceeding fifteen hundred pounds." In other words, the defendant's second prayer instructed the jury that the guaranteed live load capacity of the truck did not include the weight of the body, except to the extent of fifteen hundred

pounds.   That was not in accordance with the proper construction of the contract.

For the reasons stated there was also error in the granting of the defendant's first prayer and the rejection of the plaintiff's second prayer.   The plaintiff's first prayer was properly rejected because the defendant did not guarantee that the truck was fit or suitable for the work for which it was purchased, and the contract expressly provided: "No guarantee express or implied other than herein stated is made by the company."

No objection was made in this Court to the granting of the defendant's third prayer, and the exceptions to the rulings of the court on the evidence were not pressed.   We think the evidence referred to was properly excluded, but because of the error in the rejection of plaintiff's second prayer, and the granting of his third prayer in connection with defendant's second prayer, and the granting of defendant's first and second prayers, the judgment appealed from must be reversed.

> *Judgment reversed with costs and new trial*
> *awarded.*